STATE ex rel. C. E. JENNISON v. JOSHUA ROGERS.[1]

July 11, 1902.

Nos. 13,053—(176).

## Minneapolis Board of Education—Annuities for Teachers.

The board of education of the city of Minneapolis adopted certain rules and regulations which provided that one per cent. of the salaries of all teachers employed by the board should be deducted and paid into a fund for the purpose of providing annuities for teachers becoming incapacitated by reason of long service. When teachers were employed by the board they were required to enter into a contract consenting that such percentage of their salaries should be diverted by the board of education for the purpose of establishing such fund. *Held*, that the act of the board in providing for and in exacting by contract such a percentage of salaries was not authorized by law, and was void.

Alternative writ of mandamus issued out of the district court for Hennepin county, directed to Joshua Rogers, as comptroller of the city of Minneapolis. From a judgment quashing the writ, entered pursuant to the findings and order of Simpson, J., plaintiff appealed. Affirmed.

*Woods, Kingman & Wallace* and *Hahn, Belden & Howley*, for appellant.

*Frank Healy* and *L. A. Dunn*, for respondent.

LEWIS, J.

Action by relator to obtain a writ of mandamus requiring respondent, as comptroller of the city of Minneapolis, to sign a warrant drawn by the board of education upon the city treasurer for the sum of $608.37, in favor of John A. Schlener, as trustee of of the so-called "Teachers' Retirement Fund." The amount of the warrant represents one per cent. of the salaries of all the teachers employed in the public schools in Minneapolis for the month of November, 1901. An alternative writ was issued by the court below requiring respondent to show cause why he should not sign the warrant. Upon the return day respondent moved to quash the

[1] Reported in 91 N. W. 430.

alternative writ. The motion was granted, and relator appealed from the judgment entered thereon.

The petition alleged that on May 28, 1901, the relator entered into a written contract of employment with the board of education of Minneapolis to teach during the school year of 1901–1902, at a salary of $135 per month, and the contract of employment contained the following clause:

"It is agreed that the board may deduct monthly from your salary one per cent. thereof, which, with other funds that may be contributed for the same purpose, shall create a permanent teachers' retirement fund, which shall be held, invested, distributed, and paid out only according to rules and regulations of the board of education respecting such fund."

The rules and regulations referred to in this contract are too long to be inserted in full in this opinion, but the most important sections requiring consideration may be abbreviated as follows:

Section 124: From and after July 1, 1900, there shall be deducted from the salaries of all teachers regularly in the employ of the board, monthly, one per cent. thereof, which sum so deducted shall constitute a teachers' retirement fund, which shall be held, invested, and distributed in the manner and for the benefit of the persons prescribed by these rules and regulations. Such fund shall be divided into a permanent fund and an annuity fund. The first $20,000 shall be accumulated with one-fourth of the increase therefrom, and shall constitute a permanent fund, no part of which shall be used to pay any annuity or expense. The remainder of the retirement fund, including the other three-fourths of the income from the permanent fund, shall constitute the annuity fund, out of which all annuities and expenses shall be paid.

Section 125: All moneys belonging to the retirement fund, and all increase thereof, until invested or paid out as herein provided, shall be deposited in the name of the secretary of the board of education, as trustee, for the benefit of the retirement fund, in such banks as may be selected from time to time by the board of trustees.

Sections 126 and 127 provide for a board of trustees, consisting of six members, three to be selected by the teachers from among

their number, and the other three to be the president of the board of education, chairman of the finance committee, and the superintendent of schools. To this board of trustees is given authority to invest all the money in the retirement fund, all investments to be made in the name of the board of education. Subsequent sections provide regulations for the payment of money out by checks, and a system of bookkeeping; and the beneficiaries of the fund are as set forth in section 130:

"Teachers who shall have taught in the Minneapolis public schools for a period aggregating twenty years or more of actual service, and who, subsequent to the first day of July, 1900, either at their own request, or on motion of the board of education, shall be or shall have been retired by the board of education from service therein on account of age or mental or physical disability, shall, from and after such retirement and until his or her death, receive, quarterly, in equal instalments, out of said annuity fund, the following annuities respectively, to-wit: (1) Teachers who shall have so taught for a period aggregating twenty years, and not exceeding twenty-five years, shall each receive an annuity not exceeding $200 each, per year. (2) Teachers who shall have so taught for a period aggregating twenty-five and not exceeding thirty years, shall each receive an annuity of not exceeding $225 each, per year. (3) Teachers who shall have taught for a period aggregating thirty years or more, shall each receive an annuity of $250 each, per year."

Then follow certain provisos, and section 131, which reads:

"If any teacher shall be retired by the board of education after fifteen and before twenty years' service in the public schools of Minneapolis for any of the causes aforesaid, such teacher upon retirement shall receive back the sums so deducted from his or her salary."

The petition for the writ contains the following allegation:

"Plaintiff further alleges that the establishment and maintenance of a teachers' retirement fund, in the manner and for the purposes set forth in said contract, and in said rules as hereinbefore alleged, does and will conduce to the betterment of the service of the teachers in the schools of said city of Minneapolis, and is and will be in furtherance of the best interests of the public."

Upon the part of appellant it has been argued that the clause in

the contract with the board of education permitting a deduction of one per cent. of the salaries affects merely the mode of payment of that percentage of the salaries, and is equivalent to an assignment by the teachers of that portion of their salaries to the trustee fund, and that the payment of such percentage of the salaries into the trustee fund is incident to and within the power of the board of education. Upon the other hand, it is contended by respondent that the board of education possessed no authority to make the contracts referred to, and that its act in passing the resolutions and regulations, as well as in exacting the contract from the teachers, was ultra vires and void; also that the one per cent. of the salaries thus diverted and paid into the trustee fund was a part of the public moneys of the district, and the act of the board in diverting it from its legitimate channel was ultra vires.

We must first consider the authority with which the board of education is vested. The powers of the board are found embraced within the following laws: Sp. Laws 1878, c. 157, as amended by the following acts, to-wit: Sp. Laws 1879, c. 62; Sp. Laws 1881, c. 114; Sp. Laws 1881 (Ex. Sess.) cc. 49, 52; Sp. Laws 1883, c. 233; Sp. Laws 1885, cc. 86, 97; Sp. Laws 1887, c. 22. The pertinent part of the law reads as follows:

"It shall have the entire control and management of all common schools within the city of Minneapolis. It shall be entitled to demand, have and receive all moneys which have accrued or shall accrue to either of said districts, or to said united district, for school purposes, under any law of this state, or otherwise, and may appropriate and use such moneys for the support and maintenance of the schools within such district as such board may deem best. It may also hire or erect and maintain, as it shall deem best, school-houses and school-rooms, but it shall never erect any building upon land to which it has not the title in fee simple. It may employ superintendents and teachers, and make rules and regulations for the government of schools, and for the employment and examination of teachers, and prescribing their powers and duties; and prescribing the description, grading and classification of scholars and their management, and the course of instruction and books to be used, and all other matters pertaining to the government and welfare of schools. It may also make by-laws, rules and regulations for its government. * * * Said board of education is hereby authorized and empowered to levy upon

the taxable property in said city such taxes as will raise sufficient sums of money for all school purposes of every character, including the purchase of sites and building and repairs of school houses, and expenses incident to the maintenance thereof, and as will also provide for the prompt payment of all indebtedness of said district: Provided, that the aggregate annual levy of such taxes shall never exceed in any one year four mills on the dollar upon the assessed valuation of such district."

From a consideration of these statutes, we do not think the legislature intended to confer upon the board of education authority to exact from the teachers one per cent. of their salaries for the purposes outlined in the rules and regulations above referred to. The question before us must be disposed of upon the facts appearing in the petition, and we are not prepared to concede that the relator voluntarily relinquished that proportion for such purposes. The conviction cannot be avoided that the effect of such requirement, when applied to all teachers employed, must be to compel some of them, at least, to enter into the contract upon compulsion and without any expectation of receiving any personal benefit therefrom. It is difficult, therefore, to sustain the validity of the act on the part of the board of education in thus withholding the one per cent. of the salaries upon the ground that such a plan was voluntarily entered into by the teachers in signing the contract.

If a scheme or plan had been adopted among the teachers themselves whereby they voluntarily surrendered a certain proportion of their salaries for the purpose of providing an annuity fund, and the members of the board had volunteered to assist in perfecting and carrying out such a plan, then clearly there would be no ground upon which the city could interfere, and we do not undertake to say that in the furtherance of such a scheme some part of the salaries might not be assigned by the teachers and paid directly into the proper fund out of the city treasury. But we are not dealing with such a condition. Here the board of education are not acting voluntarily, as individual members, but they have acted and are acting as a board, claiming to be clothed with authority under the law to exact from the teachers employed a certain percentage of their compensation. It may be admitted that the

purpose to be accomplished in providing an annuity for those who have been faithful, and who have become incapacitated in the service, is a worthy one, and, in a general sense, for the benefit of the schools.

We do not wish to intimate that the care of those who have given their life-work to a cause of such benefit to the public may not to some extent be provided for when the limit of activity is reached, and the fund for that purpose be raised by taxation. It certainly conduces to the welfare of the school system to make it profitable and attractive for persons to devote themselves to the work, and, if it would attract to the service a better class of teachers, is not such an object for the benefit and welfare of the school system? Conceding, therefore, that the legislature might grant the power, within proper limits, to provide a fund for such a purpose, it is very clear that it has not been done by the enactments above referred to. At the time of the passage of these laws we are not aware that any such power had been exercised by boards of education within this state. The legislature had never attempted to deal with the subject, and no board of education had ever endeavored to put it in use. There is no reason for assuming that the legislature contemplated any such object, and there is certainly nothing within the language employed to intimate that such unusual and extraordinary power was intended to be implied.

The authority of the board is also questioned upon the ground that the money retained is in fact public money, and not the private funds of the teachers. It does not seem very material whether the money so assigned be considered public or private funds,—the result must be the same. But it is interesting to notice what the practical effect is of carrying out the plan outlined in the petition. If the entire salary had been paid to relator, and he had then voluntarily relinquished or paid back one per cent. thereof for the purposes expressed, it would clearly be private money; but one per cent. never had been paid in fact, and it never was contemplated that it should be. When the relator entered into the contract he surrendered absolute control over that portion of his salary, and, in effect, entered into a contract with the board

that his salary would be ninety-nine per cent. of the amount nominally stated. So from this view of the case it appears to us that the money retained never left the treasury, but remained public money, and the board of education had no authority to divert it from the uses mentioned in the statute.

Judgment affirmed.